UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | File No. 1:12-cr-00081-jgm-1 |
| | : | |
| ANDREW DANTE WILLIAMS, | : | |
| Defendant. | : | |
| | : | |

MEMORANDUM AND ORDER ON DEFENDANT'S SUPPRESSION MOTION
(Doc. 16.)

I.  Introduction

The Government has charged the Defendant, Andrew Dante Williams, with conspiracy to distribute oxycodone in violation of 21 U.S.C. §§ 846, 841(a)(1).  (Doc. 12.)  The Defendant moves to suppress all evidence and statements obtained as a result of a vehicle stop on June 12, 2012 in White River Junction, Vermont.  (Doc. 16.)  He asserts that the stop violated his Fourth Amendment constitutional rights.  Id.  The Defendant also moves to suppress statements he made at the stop and during a subsequent interview at a police station on the grounds that law enforcement officers violated his Fifth Amendment constitutional rights.  Id.  The Government opposes the motion.  (Doc. 20.)  The Court held an evidentiary hearing on October 10, 2012 at which Special Agent Thomas Doud and Supervisory Special Agent James Mostyn testified.  (Doc. 22, Suppression Hearing Transcript ("Tr.").)  Following the hearing, only the Defendant filed additional briefing.  (Doc. 23.)

For the reasons stated below, the Court denies the Defendant's motion.

II.  Factual Background

The following facts are taken from the evidence presented at the October 10th hearing, as well as other documents submitted as evidence by the parties.

A.  The Investigation

In early June 2012, agents at the Drug Enforcement Administration ("DEA") learned from a confidential informant that an oxycodone supplier from the Philadelphia, Pennsylvania area sold large quantities of oxycodone to various distributors throughout Vermont. (Tr. at 4-5.) The informant told the agents that the supplier was a black male nicknamed "D." Id. at 5-6. The agents also learned from the informant that "D" often made these trips in rental cars with one or two black males. Id. at 8. The informant explained that "D" no longer traveled to Rutland, Vermont due to recent law enforcement activity there. Id. The informant had never met "D." Id. at 9. He obtained this information from two oxycodone distributors in Vermont. Id. at 6.

Posing as one of these distributors, the informant arranged to purchase oxycodone from "D" at a McDonald's restaurant in White River Junction, Vermont. Id. at 7, 12-13, 19. He agreed to pay twenty-five dollars per thirty-milligram pill. Id. at 18. The informant made this arrangement through phone calls and text messages to a number with a Philadelphia area code. Id. at 9. The informant provided the number to the DEA agents, who then subpoenaed its toll records. Id. The records listed numerous phone calls to Vermont, including some to the Rutland area. Id. at 10. The records did not confirm that the number belonged to "D," instead listing "Frank Sinatra" as the subscriber. Id. at 9-10.

On the night before the transaction, a DEA agent, Thomas Doud, met with representatives from several law enforcement agencies to discuss drug trafficking in the Rutland area. Id. at 4, 14. He mentioned he anticipated encountering an oxycodone supplier nicknamed "D" the following

day.  Id. at 14.  An agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), James Mostyn, responded that, earlier in 2012, a cooperating oxycodone distributor in Rutland had described her supplier as a black male from the Philadelphia area nicknamed "D."  Id. at 14, 47, 49-50.  Immediately following the meeting, Agent Doud reviewed a probable cause affidavit charging the cooperating distributor.  Id. at 15-16.  In addition to confirming the information Agent Mostyn had already provided, the affidavit revealed that the cooperating distributor's supplier often traveled with a heavyset black male with a beard and that he charged twenty-five dollars per thirty-milligram pill.  Id. at 16-18.  See also Ex. 1 at ¶ 26.

      B.      The Surveillance

On the morning of the transaction, Agent Doud began surveilling the McDonald's with other DEA and ATF agents.  Id. at 19-20.  The informant and "D" had agreed to meet there at 11:00 a.m.  Id. at 20.  Instead of traveling to the McDonald's, the informant stayed at his house, where two DEA agents met him.  Id. at 19.  The informant called "D" in the presence of these agents, who were in radio contact with Agent Doud.  Id. at 20-21.  Agent Doud was also in radio contact with the agents surveilling the McDonald's.  Id. at 21.  He relayed the informant's communications with "D" to them.  Id.

When the informant told "D" that he was waiting inside the McDonald's, "D" responded that he would arrive in a few minutes in a red truck.  Id. at 20.  Agent Doud next observed a black Jeep Cherokee pass the parking lot for the McDonald's.  Id. at 21.  After passing the McDonald's, the jeep turned around and entered its parking lot through the back entrance.  Id. at 22.  The jeep's movements led Agent Doud to believe its occupants might be conducting countersurveillance.  Id. at 22, 24-25.  In his experience, the vast majority of customers turned into the parking lot immediately, rather than loop around it as the jeep had done.  Id. at 21.

3

Agent Doud observed two black males in the jeep. Id. at 22. He had surveilled the parking lot for more than thirty minutes before observing them. Id. at 22-23. During that time, he watched every vehicle entering and exiting the parking lot. Id. at 23. He did not observe a black male in any of these other vehicles. Id. Agent Doud believed the jeep might be a rental vehicle because it was a newer model with New York license plates. Id. at 21-22, 39. He was also aware that rental agencies rented Jeep vehicles. Id. at 39.

Once in the parking lot, the jeep pulled into a space. Id. at 23. Neither of its occupants exited to purchase food. Id. at 24. Agent Doud attempted to have the informant cause "D" to identify his location in the parking lot over the phone. Id. at 23. Before the informant could do so, the jeep pulled out of the space and circled the parking lot. Id. As the jeep circled the lot, the agents with the informant reported to Agent Doud that the informant was talking with "D" over the phone. Id. at 22. At the same time he received this report, Agent Doud observed the passenger in the jeep talking on a cell phone. Id. The agents next reported that "D" had told the informant he was actually driving a gray jeep. Id. at 23. Upon hearing this report, Agent Doud requested assistance in stopping the jeep and seizing its occupants. Id. at 25, 56. He did not apply for a warrant before doing so. Id. at 30.

At the suppression hearing, Agent Doud testified regarding the color of the jeep, stating:

> [A]lthough it was purported to be a gray Jeep by "D," to me, it was black. I'm not sure what the registered color is. It could have been listed as like a slate gray or dark gray, but it was a dark gray or a black Jeep.

Id. at 24. Agent Doud did not observe a red truck in the parking lot when he requested assistance. Id. Nor did he observe a gray jeep. Id. He also testified that the jeep's occupants might have circled the parking lot to conduct countersurveillance. Id. at 24-25. Agent Doud has served as a DEA agent for twenty-nine years. Id. at 4.

4

C.    The Stop

Following Agent Doud's request for assistance, DEA and ATF agents converged on the jeep and stopped it. Id. at 25, 51. Agent Mostyn approached the passenger side of the jeep, where he observed the Defendant with his hands in the air holding an object. Id. at 51. Agent Mostyn testified that the following exchange occurred next.

> I instructed him to tell me his name. He said his name was "D." I said, "D", listen to me very carefully. Keep your hands where I can see them. Are there any weapons or anything that I need to know about in this vehicle? He said no.

Id. See also id. at 55, 58-59. Before instructing the Defendant to identify himself, Agent Mostyn did not advise him that he was under arrest. Id. at 52. Agent Mostyn then removed the object from the Defendant's hand, a cell phone, and handed it to DEA Agent Adam Chetwin. Id. at 51, 53, 57. At the hearing, Agent Mostyn justified seizing the cell phone on officer safety grounds. Id. at 52, 59.

Agent Mostyn next directed the Defendant to step out of the jeep. Id. at 51, 59. The Defendant exited the vehicle with Agent Mostyn's assistance, at which point another agent handcuffed him and took him into custody. Id. at 25, 51. Agents also handcuffed the jeep's driver at this time. Id. at 25. There was no evidence at the hearing the agents drew firearms during the stop.

While the Defendant and the driver were handcuffed in the parking lot, Agent Doud asked each of them to state their names. Id. The Defendant refused to state his name. Id. The driver identified himself as Monte Carney. Id. at 25-26. Agent Chetwin brought the Defendant's cell phone over to another agent during this time. Id. at 26. That agent dialed the number the informant had used to communicate with "D." Id. The Defendant's cell phone rang in response.[1]

---

[1] While they ultimately found two cell phones on the Defendant, the agents only used the cell phone seized by Agent Mostyn to confirm the Defendant's identity. See id. at 26, 53.

Id. The agents placed this call only a minute or two after the stop. Id. Having learned that the Defendant refused to identify himself and that his cell phone had rung in response, Agent Doud instructed the agents to transport the Defendant and Mr. Carney to a nearby police station. Id. at 26-27.

    D.    The Interview

At the station, Agent Doud learned the Defendant had admitted his nickname was "D." Id. at 27. With Agent Mostyn and another agent present, Agent Doud proceeded to read the Defendant his Miranda rights. Id. at 27, 29, 42-43, 53-54. After acknowledging them, the Defendant submitted to an interview. Id. at 29, 54. Agent Doud never provided the Defendant with a Miranda waiver form to sign. Id. at 43. Nor did the Defendant ask for an attorney during the interview. Id. at 29, 42, 54. Agent Doud terminated the interview because he questioned the veracity of the Defendant's responses. Id. at 29.

III.    Discussion

    A.    Standard of Review

The initial burden of production and persuasion generally rests upon the defendant at a suppression hearing. United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980). "The defendant must present a prima facie case showing a Fourth Amendment violation, i.e., that a government official, acting without a warrant, subjected her to either an arrest or a search and seizure." United States v. Bayless, 921 F. Supp. 211, 213 (S.D.N.Y. 1996) (citing cases), aff'd, 201 F.3d 116 (2d Cir. 2000). "[O]nce [the defendant] establishes a basis for his motion, the burden rests upon the [g]overnment to prove, by a preponderance of the evidence, the legality of the actions of its officers." United States v. Wyche, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004). Thus, "[w]hen [the government] has acted without a warrant, the ultimate burden of persuasion is then upon the

6

government to show that its evidence is not tainted." Bayless, 921 F. Supp. at 213 (quoting United States v. Bonilla Romero, 836 F.2d 39, 45 (1st Cir. 1987)). Likewise, if a suspect makes a statement during a custodial interrogation, the government "bears the burden of demonstrating a knowing and voluntary waiver" of his or her rights under Miranda v. Arizona, 384 U.S. 436 (1966). United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011).

    B.    The Arrest

The Defendant seeks to suppress the fruits of his arrest by asserting the agents violated the Fourth Amendment in stopping the jeep. (Doc. 16 at 1.) He acknowledges the agents had reason to believe a drug transaction would take place in the McDonald's parking lot on the morning of his arrest. Id. at 3. Because the agents lacked a sufficient description of the subject of the investigation, known then by the nickname "D," the Defendant asserts the agents also lacked probable cause or a reasonable suspicion to stop the jeep. Id.; Doc. 23 at 2-3. This argument is unavailing. While the Defendant had yet to tell the agents his name was "D" when they stopped the jeep, the Government has shown the agents had probable cause to believe "D" was in the jeep. Agent Doud's surveillance of the jeep, contemporaneous communications with agents supervising the informant, and prior investigation of "D" established probable cause at that time. Even assuming Agent Doud lacked probable cause, he nevertheless had a reasonable suspicion to stop the jeep. Under this alternate theory, Agent Mostyn obtained probable cause to arrest the Defendant during the brief investigatory stop that followed. Because there was probable cause to arrest the Defendant either when (1) Agent Doud ordered the jeep stopped or (2) the Defendant told Agent Mostyn his name was "D," his arrest did not violate the Fourth Amendment.

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless arrest is

unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed." United States v. Delossantos, 536 F.3d 155, 158 (2d Cir. 2008). Probable cause exists where the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id. (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). This standard is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. at 159 (quoting Maryland v. Pringle, 540 U.S. 366, 370 (2003)) (internal quotation marks omitted). In applying it, "a court must examine the totality of the circumstances of a given arrest . . . from the perspective of a reasonable police officer in light of his training and experience." Id.

When they began surveilling the parking lot, the agents already had probable cause to arrest "D," provided they could positively identify him. The investigation before the stop provided them with reasonably trustworthy information that "D" distributed oxycodone in Vermont, including: (1) a first-hand report from an oxycodone distributor in Rutland that "D" brought significant amounts of oxycodone to Vermont from the Philadelphia area; (2) second-hand reports from two other oxycodone distributors corroborating this information; (3) the toll records of a Philadelphia phone number purportedly used by "D" that evidenced significant contact with Vermont; and (4) both monitored and unmonitored communications between "D" and the informant regarding the sale of oxycodone at the McDonald's. See United States v. Gagnon, 373 F.3d 230, 235 (2d Cir. 2004) (identifying "the extent to which an informant's statements . . . are independently corroborated" as relevant in assessing whether the statements may establish probable cause). If "D" showed up at the McDonald's on the morning of the controlled transaction, the agents would have more reason to

8

believe he distributed oxycodone in Vermont. The agents just needed to identify him at the McDonald's.

Agent Doud obtained probable cause to arrest the passenger in the jeep immediately before he instructed the agents to stop it. At that time, Agent Doud had reason to believe: (1) the jeep had arrived at the McDonald's parking lot about when "D" anticipated arriving there; (2) the two black males in it matched the general description of "D" and his associate compiled during the investigation; (3) none of the other vehicles surveilled had occupants matching this description; (4) the jeep had appeared to engage in countersurveillance of the parking lot; (5) it had out-of-state plates and might be a rental vehicle; (6) its passenger spoke on the phone at the same time "D" spoke with the informant; (7) "D" had revealed to the informant he was driving a jeep; and (8) the gray jeep "D" purported to occupy was a similar color to the black jeep in the parking lot. Not one of these observations would establish probable cause on its own. Id. at 236. Viewing them together, however, these observations established probable cause for Agent Doud to believe the subject of the investigation, "D," was in the jeep. See United States v. Cruz, 834 F.2d 47, 51 (2d Cir. 1987) (finding probable cause based on "the totality of the circumstances as appraised by experienced drug enforcement agents").

Even assuming the agents lacked probable cause to arrest "D" before the stop, the stop would constitute a constitutionally permissible Terry stop. Terry v. Ohio, 392 U.S. 1, 30 (1968), "carve[s] out an exception to the general rule requiring probable cause for a search, permitting an investigating officer briefly to detain an individual for questioning if the officer has a reasonable suspicion 'that criminal activity may be afoot.'" United States v. Colon, 250 F.3d 130, 134 (2d Cir. 2001). "A Terry stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest."

United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007). To "decid[e] whether a Terry stop is reasonable under the Fourth Amendment, a reviewing court must determine, first, 'whether the officer's action was justified at its inception, and [second,] whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Bayless, 201 F.3d 116, 132 (2d Cir. 2000) (quoting Terry, 392 U.S. at 20). When a Terry stop exceeds the scope of this justification, thereby converting into a de facto arrest, it must be supported by probable cause. United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990).

For the same reasons he had probable cause to stop the jeep, Agent Doud also had a reasonable suspicion to do so. "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002) (quoting Terry, 392 U.S. at 27). A court instead examines the "totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Id. at 273. Agent Doud did not act on a mere hunch here. Id. Rather, his surveillance of the jeep, contemporaneous communications with agents supervising the informant, and prior investigation provided him with a particularized and objective basis for suspecting the passenger in the jeep was the subject of the investigation. Id. At a minimum, Agent Doud had a reasonable suspicion to stop the jeep.

When the Defendant identified himself as "D" to Agent Mostyn, Agent Mostyn knew the agents had stopped the correct jeep. To the extent Agent Doud lacked probable cause to arrest the Defendant initially, Agent Mostyn obtained it at this point. Significantly, Agent Mostyn made it clear in his testimony that he asked the Defendant his name, learned it was "D," and then ordered him out of the jeep. (Tr. at 51, 55, 58-59.) The Defendant's assertion that the agents exceeded the

10

scope of a Terry stop for oxycodone trafficking before obtaining probable cause to arrest him is therefore unavailing. The agents' actions that could potentially convert the stop into a de facto arrest requiring probable cause, i.e. ordering the Defendant out of the jeep and handcuffing him, occurred after the Defendant revealed his name to Agent Mostyn.[2] But see Alexander, 907 F.2d at 273 (no de facto arrest where officers unholstered guns, ordered the defendants to exit car, and frisked them after observing possible drug transaction and evasive driving). In asking the Defendant's name before arresting him, Agent Mostyn acted within the confines of Terry v. Ohio.

The Defendant also argues Agent Mostyn violated Miranda v. Arizona by asking him to identify himself before advising him of certain constitutional rights guaranteed by the Fifth Amendment. (Doc. 23 at 3-4.) The administration of Miranda warnings is only required before a custodial interrogation. Georgison v. Donelli, 588 F.3d 145, 155 (2d Cir. 2009). An individual is in custody for Miranda purposes when "subjected to restraints comparable to those associated with a formal arrest." Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 441 (1984)). In asking the Defendant his name as he sat in the jeep following the stop, Agent Mostyn did not place the Defendant in custody. There is no evidence Agent Mostyn, or any other agent in the parking lot, even drew a gun during the stop. Moreover, Agent Mostyn did not interrogate the Defendant by asking him to identify himself. The Second Circuit has made it clear that "the solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by Miranda v. Arizona." United States v. Adegbite, 846 F.2d 834, 838 (2d Cir. 1988) (refusing to suppress defendant's acknowledgment of his nickname).

---

[2] Consequently, the Court does not need to reach a closer question: whether the investigatory stop exceeded its scope before the Defendant's ringing cell phone confirmed his identity to Agent Doud.

C. The Search

The Defendant asserts the warrantless search and seizure of his two cell phones violated the Fourth Amendment. (Doc. 16 at 10-11; Doc. 23 at 4-5.) The search-incident-to-arrest exception to the warrant requirement authorizes an arresting officer to search a person lawfully arrested and "the area within his immediate control." Arizona v. Gant, 556 U.S. 332, 339 (2009) (internal quotations omitted). Provided the officer had probable cause to arrest before the search, the exception applies regardless of whether a search "occurred prior or subsequent to [the] arrest." United States v. Wilson, 94 Fed. App'x. 14, 17 (2d Cir. 2004). Agent Mostyn seized a cell phone the Defendant was holding immediately before ordering him to exit the jeep, at which point other agents took him into custody. The agents subsequently found another cell phone on his person. The agents had reason to believe the Defendant used these phones to setup oxycodone sales, including the controlled transaction that morning. See United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009) (explaining that "manifest need . . . to preserve evidence" permits officers to search cell phones incident to an arrest). The seizure and search of the Defendant's cell phones falls within the search-incident-to-arrest exception.

D. The Interview

The Defendant seeks to suppress statements he made to agents at the police station on the grounds that the agents failed to comply with Miranda v. Arizona. (Doc. 16 at 8-11). Miranda requires law enforcement officers to apprise all criminal defendants of "certain rights before a custodial interrogation may begin, including, of course, the right to remain silent and be afforded the assistance of counsel. But once those warnings are properly administered . . . a defendant is left to make his own choice as to how best proceed." Plugh, 648 F.3d at 125. A defendant may unambiguously invoke his or her Miranda rights, thereby cutting off further

questioning, or a defendant may "knowingly and voluntarily waive those rights and cooperate fully." Id. There was no evidence at the hearing the Defendant unambiguously invoked his Miranda rights at the police station. Rather, Agent Doud and Agent Mostyn both testified that Agent Doud orally administered warnings. The Defendant acknowledged these warnings and did not request an attorney during the interview that followed. Through the testimony of these agents, the Government has shown the Defendant knowingly and voluntarily waived his rights before the interrogation. Id. at 128. While the Defendant emphasizes he never signed a waiver form, see Doc. 16 at 9-10, "an express statement by the defendant is not necessary to establish such a waiver." United States v. Rubio, 709 F.2d 146, 152 (2d Cir. 1983). "[T]he law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Plugh, 648 F.3d at 127 (quoting Berghuis v. Thompkins, 130 S. Ct. 2250, 2262 (2010)).

IV.	Conclusion

For the above reasons, the Defendant's motion to suppress (Doc. 16) is DENIED. This case will be placed on the January 24, 2013 trial calendar.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 17th day of December, 2012.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge